RAYMOND WALTER WELLS, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wells v. Commissioner
Docket No. 24613-81.
United States Tax Court
T.C. Memo 1984-507; 1984 Tax Ct. Memo LEXIS 164; 48 T.C.M. (CCH) 1200; T.C.M. (RIA) 84507; September 24, 1984. Cecil A. Hartman, for the petitioner. Byron Calderon, for the respondent. SWIFT MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a statutory notice dated June 26, 1981, respondent determined a deficiency in the amount of $550.00 in petitioner's Federal income tax liability for the year 1978.The issues for decision are: (1) whether petitioner was engaged in the trade or business of gambling in 1978, the resolution of which determines whether petitioner is subject to the minimum tax and (2) whether petitioner is subject to the self-employment tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference. Petitioner Raymond Walter Wells resided in Colorado Springs, Colorado, at the time the petition was filed in this case. Petitioner timely filed his individual Federal income tax return for the year 1978. Petitioner was a full-time gambler during the year in issue. He had no outside employment and no income from sources other than *166 gambling in 1978. During the year in issue he wagered extensively on parimutuel greyhound races at the tracks within the Colorado racing circuit. On the Colorado circuit, dog races are scheduled so that they are held in a particular city (such as Colorado Springs, Colorado, or Loveland, Colorado) for several months and then move on to another city in Colorado. Petitioner would rent an apartment in whichever city the races were being held at a particular time so that he could attend the races and gamble at the races in each city on the circuit. During the racing season, greyhound races were held six nights per week with additional matinee races and "schooling races." Petitioner attended virtually every "program" in each city in 1978. Each program normally consisted of twelve or thirteen races, and lasted three to four hours.Prior to each program, petitioner would spend an additional three to four hours studying notes and cards upon which he had recorded information concerning prior performances of the dogs that were scheduled to race that day. He would then develop his betting strategy for that day, identify the races upon which he would most likely place bets and *167 make tentative selections on the combinations most likely to win. Petitioner preferred to bet within the "quiniela" and "trifecta" pools because they normally contained considerably more money than did the "win", "place", or "show" pools. In order to participate in the winnings from the quiniela pool, the bettor must place his bet on the first two dogs to finish, in any order. In order to share in the winnings of the "trifecta" pool, the bet must be placed on the first three dogs to finish in the correct order. Petitioner would usually place bets on a number of combinations for any one race. Once he was at the track, he would consult the "odds board" to determine whether an overall profit would be likely on a given race. If he judged the posted odds to be unfavorable, he would not bet on that particular race. Sometimes, because of the behavior of the other bettors or a change in the odds on the board, he would change his betting strategy at the last minute. Petitioner always wagered only for his own account and never placed bets on behalf of any other person. He always used his own money. He did not sell tips or other information to other bettors. He was not a *168 bookmaker. Throughout 1978, petitioner kept records of his bets in the following manner. The race track would issue a separate ticket for each combination on which a bet is placed. Petitioner did not keep track of each individual ticket, but rather would keep track of the overall results of each race in which he bet. After each race, he would record the total amount bet on and the total winnings received from that race. The accuracy of his records have not been questioned by respondent. His records indicate that he had total receipts or "winnings" of $54,388 during 1978. His expenses or "losses" consisted of $22,046 which was the cost of purchasing tickets on races in which he held winning tickets, and $24,971 which was the cost of purchasing tickets on races in which he held no winning tickets. Petitioner therefore claims an overall net gain of $7,371 for 1978. [1]
OPINION The first issue for our consideration is whether petitioner was engaged in the trade or business of gambling during 1978. If he was, his gambling "losses" would not trigger the minimum tax *169 under section 56 [2] because they would not come within the definition of tax preference items. [3]
The evidence in this case clearly demonstrate that petitioner devoted a tremendous amount of time and effort to parimutuel gambling on dog races in Colorado during the year in issue. He attended virually every race and expended substantial amounts of time preparing for the races. He was not otherwise employed and depended upon gambling as his sole means of livelihood. In , we held on very similar facts that a full-time gambler in such circumstances was engaged in the trade or business of gambling. Therefore, the taxpayer's gambling losses were held to be deductible as trade or business expenses and did not constitute items of tax preference for purposes of section 56. *170 In , we rejected the proposition that in order to be engaged in a trade or business, one must hold one's self out to others as offering goods or services. We overruled , in which we had adopted the "goods or services" language used by Justice Frankfurter in his concurring opinion in . , held that the "goods or services" test was overly restrictive, and substituted the "facts and circumstances" standard. In so doing, we relied primarily on the Supreme Court case of , which involved an investor in real estate, stocks and bonds. The taxpayer's argument prevailed that the elements of continuity, regularity and extent (rather than "holding out goods or services to others") should control, and the Supreme Court adopted a "facts and circumstances" approach to the question of what constitutes a trade or business. Respondent acknowledges our holding in Ditunno, but urges that we reevaluate our position, particularly in light of the *171 Second Circuit opinion in , revg. and remanding a Memorandum Opinion of this Court, which rejected the "facts and circumstances" test. However, in our recently Court reviewed opinion in , we did reevaluate our position on this point, and we concluded that we would adhere to our position as set forth in Ditunno. The opinion in , reviews the case law in this area at some length, and therefore we do not consider it necessary to do so again here. The facts of this case are very similar to Ditunno and virtually identical to those in Groetzinger, which involved a full-time gambler who conducted his gambling activities on the same dog racing circuit in Colorado (in addition to one in Florida) during 1978, the same year of petitioner's betting activities which are in dispute herein. Petitioner's activities were regular, frequent and substantial, and we hold that they constituted a trade or business. Consequently, petitioner may properly deduct his gambling losses as trade or business expenses *172 under section 62(1) and therefore petitioner is not subject to the minimum tax under section 56. The second issue for our consideration is whether petitioner is properly subject to the self-employment tax. Section 1401(a) imposes a tax on every individual's "self-employment income," which is defined in section 1402(b) as the "net earnings from self-employment," subject to the limitations therein.Section 1402(a) defines the term "net earnings from self-employment" to mean "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business * * *." Net earnings of less than $400 for the taxable year are excluded. Section 1402(b)(2). Petitioner argues that we should apply , which, he asserts, was the authority in 1978 which governed the application of self-employment tax to a professional gambler. As we have indicated, that case was expressly overruled by , and no longer provides any support for petitioner's position. Petitioner was clearly not employed *173 by anyone but himself during 1978, and he has not demonstrated the applicability of any exception to the self-employment tax. Given our finding that petitioner is engaged in the trade or business of gambling, and the fact that petitioner's net earnings from self-employment exceeded $400 during 1978, we hold that he is properly subject to the self-employment tax on his net earnings therefrom. Finally, in light of our resolution of the "trade or business" issue, it is not necessary to address petitioner's arguments to the effect that he should be allowed to "net the races" or, alternatively, net all losses from his winnings prior to recording "gross income" on his tax return. Those arguments pertain to the applicability of the minimum tax, and are therefore rendered moot. Pursuant to the resolution of the issues as set forth above, Decision will be entered under Rule 155.
Footnotes
1. Total winnings of $54,388 less total expenses of $47,017 ($22,046 plus $24,971) equals $7,371.↩
2. Unless otherwise indicated, all section references are to the Intenal Revenue Code of 1954, as amended and in effect during the year in issue. ↩
3. Respondent claims that petitioner was not in the trade or business of gambling. If correct, petitioner's gambling losses would be itemized deductions and would constitute tax preference items under § 57.↩